Filed 2/17/23 In re G.W. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. E.W., Defendant and Appellant. | E079590 (Super.Ct.Nos. J286484 & J286485) OPINION |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Affirmed in part; conditionally reversed in part with directions.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Dawn M. Martin, Deputy County Counsel, for Plaintiff and Respondent.

1

E.W. (father) appeals from orders terminating his parental rights to his children, J.W. and G.W. (the children), contending: (1) substantial evidence does not support the juvenile court's finding that the children were adoptable; and (2) the San Bernardino County Children and Family Services (CFS) did not comply with its initial duty to adequately inquire whether the children were Indian children under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related state law. CFS concedes a conditional remand is appropriate to conduct a sufficient inquiry under ICWA but argues substantial evidence does support the juvenile court's adoptability findings and father forfeited his related claims of error with respect to potential legal impediments to adoption and the inadequacy of the social worker's reports admitted into evidence during the permanency hearing.

By not objecting, father (who was not present during the termination hearing) forfeited his arguments that an open investigation into alleged sexual and emotional abuse of J.W. was a potential legal impediment that prevented the juvenile court from finding either child was adoptable and that the social worker's reports inadequately supported CFS's opinion that J.W. was adoptable. In addition, we grant CFS's request to augment the record with a subsequent minute order, which establishes the investigation into the referrals was completed and the allegations determined to be unfounded before

the juvenile court terminated father's parental rights.[1]  Therefore, the claim on appeal about a potential legal impediment to adoption is rendered moot.  Moreover, reviewing the entire record, we conclude substantial evidence supports the juvenile court's adoptability findings.

However, we accept CFS's concession that its initial inquiry under ICWA was inadequate and conditionally reverse the orders terminating father's parental rights and remand for further inquiry.

## I.

## FACTS AND PROCEDURAL BACKGROUND

At a combined jurisdiction and disposition hearing conducted on September 23, 2020, the juvenile court sustained petitions filed by CFS alleging the children were dependents under Welfare and Institutions Code[2] section 300, subdivision (b)(1), finding true: (1) father failed to provide a safe and appropriate living environment for the children; (2) father had a history of engaging in domestic violence; and (3) mother[3] failed to adequately supervise or protect the children.  Father was found to be the children's

---

[1] On December 21, 2022, CFS filed a request to augment the record on appeal. Appellant's reply brief includes opposition to the request.  On February 2, 2023, ruling on the request was reserved for consideration with this appeal.  As explained more fully, *post*, the request is granted.

[2] All undesignated statutory references are to the Welfare and Institutions Code.

[3] Mother (A.H.) did not appeal the orders terminating her parental rights to the children, but our conditional reversal will inure to her benefit. (See Cal. Rules of Court, rule 5.725(a)(1), (f); all further references to rules will be to the Cal. Rules of Court.)

presumed father. The juvenile court declared the children dependents, removed them from their parents' care and custody, and ordered CFS to offer the parents family reunification services. The parents were granted visitation, but the court ordered there be no visits between the children and father's girlfriend or her son, and that there were to be no third parties present during visits.

At the detention hearing, both parents denied having any known Indian ancestry. Before the jurisdiction hearing, both parents completed Judicial Council form ICWA-020 and again denied they had any known Indian ancestry. They provided CFS with the names of some relatives to assist in further ICWA inquiry, but there is no indication in the jurisdiction report that the relatives were interviewed. The juvenile court followed CFS's recommendation and found that the children did not come within the provisions of ICWA.

In the six-month status review report, filed March 15, 2021, CFS reported father had completed his case plan, which included therapy and parenting classes, but that he did not understand his responsibility in the children's removal. Father continued to be in a relationship with his girlfriend and denied that she was an issue for the children. CFS recommended the juvenile court order that the children remain out of the parents' custody and the parents continue receiving services. The report stated ICWA did not apply.

CFS reported that the children had been having a difficult time visiting with father. G.W. became upset during visits and began to experience thoughts of self-harm, and J.W. cried during and after visits. The previous October, J.W. told the social worker that she no longer wished to visit with father because he told her he had given her cat away, but

4

later he brought the cat to her next visit despite knowing J.W. could not keep it. G.W. told the social worker father constantly mentioned his girlfriend although he knew the children did not want to hear about her. The children referred to father by his first name. The children said they were receptive to participating in family therapy with father, but later said they would not participate. G.W. had a strong reaction before a visit with father, refused to go, and drew pictures of people being stabbed. G.W. was assessed under section 5150 for an involuntary hospitalization but was deemed safe. G.W. had been receiving "Wrap Around" services for a month because of his behaviors and missing classes. The children reported they felt safe with their caregivers and did not want to be returned to either of their parents. J.W. was "thriving" in her caregivers' home and "doing well."

At the review hearing conducted on March 23, 2021, the juvenile court ordered father to undergo a psychological evaluation and ordered CFS to offer the parents additional family reunification services, including family therapy. The court denied CFS's recommendation that the parents have no visits, but reduced visits to one supervised visit a week including video and telephonic visits as needed.

In an information update filed May 14, 2021, CFS reported the children continued to not want to visit father. Moreover, CFS reported that father's girlfriend had falsely posted on social media that G.W. was missing. At an appearance review hearing held six days later, the juvenile court found that regular visitation with father was detrimental to the children's physical or emotional wellbeing. The court granted authority for family therapy and therapeutic visits at the appropriate time.

5

After numerous continuances, on February 2, 2022, the juvenile court held a 12-month review hearing. J.W. testified she had last seen her parents one year ago; she had been in her current placement with her caregiver for over a year; she did not want to be returned to father's custody because he was still in a relationship with his girlfriend who was "toxic" and he had not accepted responsibility for his part in the children's removal; and she would not feel safe in his home. The juvenile court terminated the parents' reunification services and set a permanency hearing under section 366.26. Parents were advised of their writ rights but neither parent timely challenged the setting order.

In its report for the permanency hearing, CFS recommended the juvenile court terminate parental rights to G.W. and that the child be freed for adoption. CFS recommended J.W. receive permanency planning services and that the court select another permanent plan arrangement (APPLA) as the most appropriate plan for her. CFS once more stated ICWA did not apply.

The report indicated that the children had been placed together in their caregiver's "RFA home"[4] for almost two years. The children had no known medical or dental issues and they were developmentally on target. Both were doing well in school, although G.W. had been diagnosed with posttraumatic stress disorder, attention deficit hyperactivity syndrome, and major depressive disorder. G.W. had been prescribed medications and had monthly visits with a psychiatrist "for medication management." He had graduated

---

[4] RFA refers to the Resource Family Approval Program administered by the California Department of Social Services. (See https://www.cdss.ca.gov/inforesources/resource-family-approval-program [as of Feb. 17, 2023].)

from the "WRAP Program" two months earlier and had been referred for individual therapy.

In its adoption assessment of G.W., CFS opined the child was likely to be adopted and was appropriate for adoption. The child's caretakers said they loved and were dedicated to him and wanted to adopt him, and G.W. told the social worker he understood what adoption means and that he wished to be adopted by his caregivers. In fact, G.W. said, "'I already feel like their son and I am part of a real family with them.'" CFS reported the child and his caregivers' family had "developed a mutual attachment." Although G.W.'s caretakers believed he might be exhibiting signs of schizophrenia, they were aware of his diagnoses and medications, they had worked hard to stabilize him, and they "would make sure [he] continues to receive mental health treatment." The caregivers told the social worker they were prepared to meet G.W.'s social, medical, psychological, and financial needs, and they understood the legal and financial rights and responsibilities that would come with adoption. The caregivers were unwilling to allow G.W. to have postadoption contact with his family because he did not want to see them, and the caregivers believed his family was "'toxic'" for him. Therefore, CFS recommended the juvenile court find by clear and convincing evidence that G.W. was likely to be adopted, that termination of parental rights would not be detrimental to the child and terminate parental rights and free him for adoption.

With respect to J.W., the report stated the child had initially told the social worker on March 23, 2033, that she too understood what adoption means and she wanted to be adopted by her caregivers. However, On April 27, she said she did not want to be

7

adopted, she no longer wished to remain in her caregivers' home, and she was fine with being separated from G.W. CFS reported that an open referral into allegations of sexual abuse of J.W. by an unknown person and of emotional abuse by her caregiver was in the process of being investigated, and CFS was waiting for the results of that investigation to determine whether to move the child to a different placement. CFS opined J.W.'s current placement was appropriate, the caregivers had an "ongoing relationship" with her, and they were currently meeting J.W.'s needs. However, because the child said she did not wish to be adopted or have her caregivers be her legal guardians, CFS recommended the juvenile court select APPLA as the appropriate plan for her. The caregivers were "willing to keep" her under such a plan.

In an information update filed May 25, 2022, CFS reported J.W. had changed her mind again and decided she did wish to be adopted by her caregivers. She admitted to having been anxious and worried about the prospect of being adopted, and "she may have 'blown some things out of proportion.'" J.W. said that since her last conversation with the social worker, the caregivers' family had been "talking more and being more open about things." She told the social worker she also wanted to reengage in therapy, start attending church again, and get involved in a youth group so she could associate with people who would have a positive influence on her. When the social worker told J.W. that she could wait on adoption, she said she "'definitely wants to move forward with the adoption'" and wished to be adopted along with G.W.

CFS reported J.W. was appropriate for adoption, she had been placed for 20 months with a prospective adoptive family that was "dedicated to [her] and committed to raising

8

her to adulthood," and she had "developed a mutual attachment" with the family. Therefore, CFS recommended the juvenile court find by clear and convincing evidence that J.W. was likely to be adopted and that termination of parental rights would not be detrimental to the child, terminate parental rights to J.W., and free the child for adoption.

Father did not appear for the continued permanency hearing held August 4, 2022. Without objection, the juvenile court admitted CFS's reports into evidence. Father's attorney objected to CFS's recommendation that his parental rights be terminated and urged the juvenile court to adopt the lesser permanent plan of legal guardianship. Counsel for the children seconded CFS's recommendations and asked the juvenile court to find the children were generally and specifically adoptable and terminate parental rights. The juvenile court agreed, found by clear and convincing evidence that the children were likely to be adopted and they were generally and specifically adoptable, and terminated parental rights.

Father timely appealed.

## II.

## DISCUSSION

A. *The Juvenile Court's Adoptability Findings Are Supported by Substantial Evidence.*

Father argues there is no substantial evidence to support the juvenile court's adoptability findings, that the referral and investigation in alleged sexual and emotional abuse of J.W. posed a potential legal impediment to the adoption of either child by their caregivers, and CFS's adoption assessment of J.W. was inadequate and did not contain

information and analyses mandated by statute. Because father did not object to the adoptability findings because of a potential legal impediment and deficiencies in CFS's reports, he has forfeited those specific claims of error. Moreover, an update provided to the juvenile court after the permanency hearing demonstrates the investigation into the referral had been completed and closed as unfounded before the court terminated father's parental rights, so the issue of a potential legal impediment to adoption is moot. Finally, viewing the whole record, we conclude substantial evidence supports the juvenile court's findings, by clear and convincing evidence, that the children were adoptable.

        *1.      Applicable law and standard of review.*

Prior to a permanency hearing, the social worker must prepare a preliminary assessment report which analyzes "the likelihood that the child will be adopted if parental rights are terminated." (Welf. & Inst. Code, § 361.5, subd. (g)(1)(F); see Welf. & Inst. Code, §§ 366.21, subd. (i)(1)(G), 366.22, subd. (c)(1)(F); Cal. Rules of Court, rule 5.725(c).) "The purpose of the . . . report is to provide the juvenile court with the information necessary to determine the permanent plan for the children." (*In re Mary C.* (2020) 48 Cal.App.5th 793, 800, citing *In re B.D.* (2019) 35 Cal.App.5th 803, 821.) The courts have described the preliminary assessment as "'a cornerstone of the evidentiary structure' upon which the court, the parents and the child are entitled to rely." (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 11, quoting *In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.)

Inter alia, the preliminary assessment must include "[a]n evaluation of the child's medical, developmental, scholastic, mental, and emotional status" (§ 361.5, subd. (g)(1)(C);

10

see §§ 366.21, subd. (i)(1)(C), 366.22, subd. (c)(1)(C)(i)), "a social history [of the prospective adoptive parent(s)], including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption and guardianship" (§ 361.5, subd. (g)(1)(D); see §§ 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D)), and analysis of "[t]he relationship of the child to any identified prospective adoptive parent or guardian, . . . the duration and character of the relationship, the degree of attachment of the child to the prospective relative guardian or adoptive parent, the relative's or adoptive parent's strong commitment to caring permanently for the child, the motivation for seeking adoption or guardianship, a statement from the child concerning placement and the adoption or guardianship, and whether the child over 12 years of age has been consulted about the proposed relative guardianship arrangements, unless the child's age or physical, emotional, or other condition precludes the child's meaningful response, and if so, a description of the condition" (§ 361.5, subd. (g)(1)(E); see §§ 366.21, subd. (i)(1)(E), 366.22, subd. (c)(1)(E)).

The juvenile court may only terminate parental rights if it finds by clear and convincing evidence that the child is *likely* to be adopted within a reasonable amount of time (§ 366.26, subd. (c)(1); *In re Zeth S.* (2003) 31 Cal.4th 396, 406), which this court has described as "a low threshold" (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292; accord, *In re J.W.* (2018) 26 Cal.App.5th 263, 267 ["The 'likely to be adopted' standard is a low threshold."]). "The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1231, citing *In re*

*Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) The juvenile court is not *required* to find the child is either "generally" or "specifically" adoptable (*In re Mary C.*, *supra*, 48 Cal.App.5th at p. 802), though "[t]he likelihood of adoptability *may* be satisfied by a showing that a child is *generally* adoptable, that is, independent of whether there is a prospective adoptive family ""waiting in the wings""" (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1313). If a child is found to be "generally" adoptable, the court does not examine the suitability of a prospective adoptive home. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061; see *In re Scott M.* (1993) 13 Cal.App.4th 839, 844.)

In some cases, a child who was not "generally" adoptable because of age, poor physical health, or physical, emotional, or developmental disability, may still be "specifically" adoptable because a willing prospective adoptive family has been identified. (*In re R.C.* (2008) 169 Cal.App.4th 486, 494.) When the child will require total care for their entire life, the juvenile court must consider the prospective adoptive parent's ability to meet the child's needs. (*In re Carl R.*, *supra*, 128 Cal.App.4th at p. 1062.) In addition, before finding the child is "specifically" adoptable, the juvenile court must inquire whether there are any legal impediments to the specific prospective adoptive parent(s) adopting the child. (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408-1409; *In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) Common legal impediments to adoption addressed in the published decisions include a prospective adoptive parent's inability to obtain consent to an adoption from an estranged spouse (Fam. Code, § 8603, subd. (a); *In re G.M.* (2010) 181 Cal.App.4th 552, 561-563; *In re Sarah M.*, at p. 1650), and a prospective adoptive parent's prior felony convictions or

referrals for child abuse or neglect (Fam. Code, § 8712, subd. (c); *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205).

We review the whole record on appeal to determine whether it contains substantial evidence from which a reasonable juvenile court could find by clear and convincing evidence that the child was likely to be adoptable in a reasonable amount of time. (*In re Mary C.*, *supra*, 48 Cal.App.5th at p. 801; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and "'substantial" proof of the essentials which the law requires in a particular case." (*Conservatorship of O.B.*, at p. 1006.) "The evidence must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citation.] We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment of the trial court." (*In re B.D.*, *supra*, 159 Cal.App.4th at p. 1232.)

   2.   *Potential legal impediment to adoption and sufficiency of CFS's adoption assessment of J.W.*

Father argues the juvenile court erred by finding the children were adoptable because the open referral mentioned in CFS's report for the permanency hearing constituted a potential legal impediment to adoption. According to father, the allegation of sexual and emotional abuse of J.W. might have been the root cause of her wavering position on whether she wished to be adopted by her caregivers. And, if either of the allegations were found to be true, father argues they might require both children's removal from the prospective adoptive home or, at a minimum, might jeopardize

13

adoption by the family. In addition, father argues the adoption assessment for J.W. was woefully inadequate and did not include information and analysis mandated by statute.

CFS counters that father forfeited these arguments by not objecting in the juvenile court and, in any event, subsequent events have rendered moot the argument about a potential legal impediment to adoption. We agree with CFS on both counts.

"""An appellate court will ordinarily not consider procedural defects or erroneous rulings in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method.""" (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398.) Dependency proceedings are not exempt from the rule of forfeiture. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754.) Father's substantial evidence challenge to the juvenile court's adoptability findings is an obvious exception to the forfeiture doctrine. (*In re B.D.* (2019) 35 Cal.App.5th 803, 823; *In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1559-1561; *In re Erik P.* (2002) 104 Cal.App.4th 395, 399-400.) But, the courts have applied the forfeiture doctrine when a parent argues on appeal that a potential legal impediment to adoption prevented the juvenile court from finding the child was specifically adoptable but failed to raise the argument below (*In re G.M.* (2010) 181 Cal.App.4th 552, 563-564; *In re R.C.*, *supra*, 169 Cal.App.4th at p. 493, fn. 2), and when a parent fails to object that the adoptability assessment report omitted statutorily required

information[5] (*In re Mary C.*, *supra*, 48 Cal.App.5th at p. 801; *In re I.P.* (2014) 226 Cal.App.4th 1516, 1526; *In re G.C.,* at p. 1399; *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886-887; *In re Crystal J.*, *supra*, 12 Cal.App.4th at pp. 411-412).

Father essentially concedes, as he must, that he (or more precisely, his attorney) did not object to the juvenile court's adoptability findings on the grounds the referral being investigated was a potential legal impediment to adoption or that CFS's adoption assessments were inadequate. Instead, father contends he may nonetheless argue the adoptability findings are not supported by substantial evidence. We agree, of course, that father did not forfeit his general substantial evidence challenge. By not specifically objecting that the referral constituted a potential legal impediment to adoption and that the adoption assessment of J.W. was inadequate, however, he forfeited those specific claims of error.

Even if we were to conclude father did not forfeit his specific claim of error based on a potential legal impediment to adoption, the issue is now moot. "A court is tasked with the duty "'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to

---

[5] The appellate court in *In re Mary C.*, *supra*, 48 Cal.App.5th 793 noted that, although the parent there had forfeited a claim of error based on inadequacies in the assessment report, the court did "not say such omissions or deficiencies count for nothing. "'Deficiencies in an assessment report . . . go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights.""" (*In re Mary C.*, *supra*, 48 Cal.App.5th at p. 801.) Nonetheless, the court concluded the deficiencies in the assessment report "were not egregious" and did not "by themselves support reversal." (*Ibid.*)

Here too, viewing the record in its totality, the omissions from the adoption assessment of J.W. are not so egregious to support reversal.

declare principles or rules of law which cannot affect the matter in issue in the case before it.'" [Citation.] A case becomes moot when events "'render[] it impossible for [a] court, if it should decide the case in favor of [the appellant], to grant him any effect[ive] relief.'"" (*In re D.P.* (2023) 14 Cal.5th 266, 276.)

As indicated, *ante*, in the report for the permanency hearing filed May 24, 2022, CFS informed the juvenile court of an "open referral" about the alleged sexual abuse of J.W. by an unknown person and about alleged emotional abuse of J.W. by her caretaker. The referral was in the process of being investigated and CFS was awaiting the results to determine whether J.W. should be removed from her current placement. CFS provided no further information about the status of the investigation in the information update filed the next day or at the permanency hearing conducted on August 4, 2022.

CFS requests that we augment the record on appeal with the minutes of a nonappearance review hearing conducted December 15, 2022, more than four months after the permanency hearing, that reflects an update made to the juvenile court about the referral. (See rules 8.155(a)(1)(A), 8.410(b)(1).) The minute order states that on April 27, 2022, a referral had made to the child abuse hotline that J.W. "was sexually abused by a friend of the family" who regularly visited the caregiver's home, and that the caregiver "is calling [J.W.] names and does not believe the child about the [sexual] abuse." The investigation concluded: (1) J.W. had admittedly engaged in "consensual touching" with another minor, (2) at the time of the referral J.W was drinking alcohol, getting into trouble at home and school for using "edibles," and she was angry with her caregivers, and (3) both J.W. and her caregiver "denied the name calling allegations." (*Ibid.*)

16

Therefore, on May 26, 2022, the referral was "closed" as "unfounded" with respect to the alleged sexual abuse and "inconclusive" for the allegation of general neglect and emotional abuse. (*Ibid.*) The minutes also indicate that the next day, May 27, 2022, a second referral was made to the child abuse hotline alleging J.W. was being sexually abused by an unnamed person in her caregiver's home. Because the investigation of "similar allegations" of sexual abuse had just been closed as "unfounded," the new referral was "evaluated out" on June 2, 2022, "and [it] was not investigated." (*Ibid.*)

Although the information update summarized in the December 15, 2022 minute order was not before the juvenile court when it made its adoptability findings, it demonstrates that the investigations into both referrals had been closed more than two months *before* the permanency hearing. According to CFS, this renders moot father's claims about a potential legal impediment to adoption based on the previously open referrals. In his reply brief, father opposes the request and characterizes it as "a backhanded attempt to bolster the record and avoid a potential reversal," "a belated substitution for a Departmental report which [CFS] hopes can become part of the appellate record," and "a pretty outrageous request and not supported by applicable case

law or the general rules on appeal."[6] Father concedes we may properly consider "post-judgment evidence"[7] when determining whether an issue on appeal has been rendered moot, but he argues we may only take notice of the *fact* that a review hearing took place on December 15, 2022, and not of the truth of the update made to the juvenile court about the referral.[8] (See *In re M.B.* (2022) 80 Cal.App.5th 617, 626-627 [reviewing court may

---

[6] Father also chastises CFS for not providing him or his attorney with notice of the review hearing and the information update, but he was not entitled by statute or rule to notice of any postpermanency review hearings. (See Welf. & Inst. Code §§ 295, subd. (b) ["No notice shall be required for a parent whose parental rights have been terminated."], 366.3, subd. (f) ["Unless their parental rights have been permanently terminated, the parent or parents of the child are entitled to receive notice of, and participate in, those [postpermanency review] hearings."]; see also Cal. Rules of Court, rule 5.740(a)(5) ["Notice of the [postpermanency review] hearing must be given as provided in [Welfare & Institutions Code] § 295.].)

Even if father had been provided with notice, we are skeptical he could have successfully objected to the juvenile court receiving the update and acknowledging the mere facts that the investigation into the referrals had been completed and closed as unfounded and inconclusive.

[7] Although a mouthful, the December 15, 2022 minute order is more precisely labeled "post-appealable postjudgment order evidence."

[8] The record on appeal can only be augmented with documents that were "filed or lodged in the case in superior court." (Rules 8.155(a)(1)(A), 8.120(a)(1) ["normal record on appeal" includes "written documents from the superior court proceedings"].) The permanent minutes are "[c]ourt record[s]" (Gov. Code, §§ 68151, subd. (a)(3), 68152, subd. (g)(11)), and, as such, they are generally a proper subject for augmentation of the record on appeal.

In any event, even if we were to judicially notice the minute order instead of augmenting the record on appeal, we would not take cognizance of the truth of any hearsay statements contained in the order, such as the truth of J.W.'s and her caregiver's statements to investigators. By merely judicially noticing the objective facts that CFS had updated the juvenile court on the status of the referrals and that the investigation into the referrals had been closed, we conclude father's issue on appeal is moot.

18

judicially notice existence of superior court documents and rulings and of the truth of results reached, but not of the truth of hearsay statements contained therein].)

Consideration, on appeal, of the evidence that was not before the juvenile court when it ruled, is generally disfavored. (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 681; *In re K.M.* (2015) 242 Cal.App.4th 450, 455-456.) For example, our Supreme Court has held that, absent exceptional circumstances, a reviewing court should not make findings of fact on appeal by considering unsworn evidence that was *never* presented to the juvenile court (either before or after the juvenile court entered its order terminating parental rights), especially for the purpose of *reversing* the order. (*In re Zeth S.*, *supra*, 31 Cal.4th at pp. 399-400, 405.)

However, in general, a reviewing court may properly consider postjudgment evidence when determining whether an appeal has been rendered moot (*In re Allison B.* (2022) 79 Cal.App.5th 214, 219), and when deciding whether to exercise discretion to consider the merits of a moot appeal (*In re D.P.*, *supra*, 14 Cal.5th at pp. 286-287). And, relevant here, courts have augmented the record on appeal with evidence that was considered by the juvenile court after the permanency hearing when that evidence demonstrates a claimed error with respect to an order terminating parental rights was harmless and/or moot. (See, e.g., *In re B.D.*, *supra*, 159 Cal.App.4th at pp. 1239-1241 [augmenting record with addendum reports and juvenile court's subsequent orders that demonstrated a home study of prospective adoptive parents had been belatedly completed]; *In re Salvador M.* (2005) 133 Cal.App.4th 1415, 1420-1422 [augmenting record on appeal with completed home study of grandmother submitted to juvenile court

19

after permanency hearing]; see also *In re Marina S.* (2005) 132 Cal.App.4th 158, 166 [judicially noticing postpermanency minute order reflecting home study of prospective adoptive grandparents had been completed and approved by the juvenile court].)

CFS's December 21, 2022 request to augment the record on appeal with the December 15, 2022 minute order is hereby granted. (See *ante*, fn. 1.) Because the objective facts of that order demonstrate the investigation into the referral had been completed and the allegations deemed to be unfounded or inconclusive before the permanency hearing, father's assertion that the previously *open* referral was a potential legal impediment that prevented the court from finding the children are adoptable is moot.

### 3. Adoptability findings.

Father does not seriously contest the juvenile court's finding that G.W. was adoptable and that he would likely be adopted within a reasonable amount of time. For example, father concedes G.W.'s psychological and behavioral issues "do not necessarily make him unadoptable since the caretakers were aware of his issues and expressed their desire to adopt him notwithstanding." However, he argues the referral about the alleged sexual and emotional abuse of J.W., if substantiated, might result in his being placed in another home and severely compromise the evidence of adoptability. Father's argument about the adoptability finding for J.W. is based almost entirely on his related assertions that the referral and investigation into alleged sexual and emotional abuse posed a potential legal impediment to the child's adoption and CFS's adoption assessment was "bare bones" and omitted mandated information. As we have already concluded, father

20

forfeited his claims about the referral and the adequacy of CFS's report, and the referral issue is moot. We conclude the record contains ample evidence to support the juvenile court's finding that both children were likely to be adopted in a reasonable amount of time, that J.W. was both "generally" and "specifically" adoptable, and that G.W. was "specifically" adoptable.

As early as the six-month reviewing hearing, CFS reported G.W. was receiving "Wrap Around" services for his behaviors and he was reported to feel safe in his caregivers' home. By the time of the permanency hearing, G.W. had been in his caregivers' home for 20 months. The child reported he understood what adoption meant; he wanted to be adopted by his caregivers; and he already considered himself to be their son. The child had no medical or dental issues; he was developmentally on track; and he was doing well in school. Although G.W. had been diagnosed with multiple psychological disorders and syndromes, he had graduated from the "WRAP Program" and had been referred to individual therapy, and he had been prescribed medications and had monthly visits with a psychiatrist to manage his medications.

G.W.'s caregivers reported they had a mutual attachment with the child; they loved him and were dedicated to him; they were aware of his psychological diagnoses, had worked hard to stabilize him and would continue to do so; and they understood the legal and financial responsibilities associated with adoption and wanted to adopt him. "'"[I]t is only common sense that when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established. . . ."'" (*In re J.W.*, *supra*,

21

26 Cal.App.5th at p. 268, quoting *In re K.B.*, *supra*, 173 Cal.App.4th at p. 1293.) "Speculation that [the child] may have future psychological problems does not preclude a finding that he is likely to be adopted." (*In re J.W.*, at p. 268.) Therefore, we hold substantial evidence supports the finding that G.W. is "specifically" adoptable.[9]

As for J.W., the report for the six-month review hearing reported she felt safe with her caregivers, and she was "thriving" and "doing well" in the home. The report for the permanency hearing reported that J.W. had no known medical or dental issues and she was developmentally on track and doing well in school. She initially said she understood what adoption meant and wished to be adopted by her caregivers but, a month later, she changed her mind and expressed her desire not to be adopted or have her caregivers be her legal guardians, even if it meant being separated from G.W. CFS reported J.W.'s placement with her caregivers was appropriate and she had an "ongoing relationship" with them. CFS also reported the caregivers were meeting the child's needs and they were "willing to keep" her even if the juvenile court selected APPLA as the appropriate plan instead of adoption.

In the information update, CFS reported J.W. had again changed her mind and decided she "'definitely'" wished to be adopted by her caregivers along with G.W. She explained that her prior reluctance was the result of anxiousness and worries about being adopted. CFS reported J.W. had been with her caregivers for 20 months, that the caregivers were "dedicated to [her] and committed to raising her to adulthood," and the

---

[9] We need not decide whether there was substantial evidence to support the juvenile court's finding that G.W. was also "generally" adoptable.

22

child had developed a "mutual attachment" with the family. Therefore, CFS now opined J.W. was appropriate for adoption and recommended the juvenile court terminate parental rights and free the child for adoption.

As CFS contends, the record contains no evidence whatsoever that J.W. had any mental, physical, or developmental issues, which would preclude the juvenile court from finding she was "generally" adoptable. And, although the court was not required to also find J.W. was "specifically" adoptable, the record amply demonstrates her caregivers never wavered in their desire and commitment to care for and raise J.W. into adulthood, even when CFS recommended the juvenile court not select adoption as her permanent plan. In sum, we conclude the record contains substantial evidence that the child was likely to be adopted within a reasonable amount of time.

B. *CFS Concedes It Did Not Satisfy Its Duty of Initial Inquiry Under ICWA and a Conditional Reversal Is Appropriate.*

"ICWA establishes minimum federal standards that a state court must follow before removing Indian children from their families. [Citation.] California law implementing ICWA also imposes requirements to protect the rights of Indian children, their families, and their tribes. (See §§ 224-224.6; [citation].) An Indian child is any unmarried person under 18 who 'is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4); § 224.1, subd. (b).)" (*In re Ricky R.*, *supra*, 82 Cal.App.5th at p. 678.)

23

"'Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case.' [Citation.] [CFS] and the juvenile court have an 'affirmative and continuing duty to inquire' whether a child in a dependency proceeding 'is or may be an Indian child.' (§ 224.2, subd. (a).) The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry. [Citation.] ICWA also imposes a duty to provide notice of the proceedings to the pertinent Indian tribes. (25 U.S.C. § 1912(a); § 224.3, subd. (a).) Notice enables the tribes 'to determine whether the child involved in a dependency proceeding is an Indian child and, if so, whether to intervene in, or exercise jurisdiction over, the matter.'" (*In re Ricky R.*, *supra*, 68 Cal.App.5th at p. 678.)

"The duty of initial inquiry applies in every dependency proceeding. [Citation.] Federal regulations require state courts to ask each participant 'at the commencement' of a child custody proceeding 'whether the participant knows or has reason to know that the child is an Indian child.' (25 C.F.R. § 23.107(a) (2022).) State law requires the court to pursue an inquiry '[a]t the first appearance in court of each party' by asking 'each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child.' (§ 224.2, subd. (c).) In addition, when [CFS] takes a child into temporary custody, the agency must ask 'the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child,' and the reporting party whether the child is or may be an Indian child. (§ 224.2, subd. (b).) Extended family members include adults who are the child's stepparents, grandparents, siblings, brothers-or sisters-in-law, aunts, uncles, nieces, nephews, and first or second

24

cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)" (*In re Ricky R.*, *supra*, 68 Cal.App.5th at p. 678-679.)

Although the parents consistently denied having any known Indian heritage, they provided CFS with the names of extended family members for purposes of ICWA inquiry. CFS concedes "there is nothing in the record indicating [the relatives] were asked about whether they had Indian heritage" and, therefore, that it did not satisfy its duty of initial inquiry under ICWA. CFS does not oppose a conditional reversal of the orders terminating parental rights and a remand for additional ICWA inquiry. We accept CFS's concessions and so order.

## III.

## DISPOSITION

The juvenile court's orders terminating father's parental rights to the children are conditionally reversed. On remand, the juvenile court shall direct CFS to provide the court with a supplemental report detailing what efforts, if any, it has taken to obtain information about the children's possible Indian ancestry, including the names and other relevant information of family members interviewed. The juvenile court shall then determine whether the ICWA inquiry was adequate and, if applicable, whether proper notice has been given to relevant Indian tribes. If the juvenile court determines the inquiry completed and the notice given were adequate (and, if after receiving notices, the relevant tribes do not respond or respond that the children are not Indian children within the meaning of ICWA), the orders terminating father's parental rights to the children

25

shall immediately be reinstated, and further proceedings shall be conducted, as appropriate.

In the alternative, if the juvenile court determines the inquiry and/or notice conducted was inadequate, it shall direct CFS to conduct additional inquiry and provide additional notice to the relevant Indian tribes of any additional relevant information CFS might have received. The court shall then determine whether the additional inquiry and notice are adequate. If, after receiving notices, the relevant tribes do not respond or respond that the children are not Indian children within the meaning of ICWA, the orders terminating father's parental rights to the children shall immediately be reinstated, and further proceedings shall be conducted, as appropriate.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER

Acting P. J.

We concur:


MILLER

J.


CODRINGTON

J.

26